# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KAREN J. MURPHY, ) | |
| ) | No. 12 CV 3879 |
| Plaintiff, ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner, Social Security ) | |
| Administration,[1] ) | |
| ) | August 27, 2013 |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

Karen Murphy seeks Disability Insurance Benefits ("DIB") based on her claim that the residual effects of a stroke she suffered in 2007 rendered her disabled before her date last insured. After the Commissioner of the Social Security Administration denied her application, Murphy sought judicial review of the denial pursuant to 42 U.S.C. § 405(g). Before the court is Murphy's motion for summary judgment seeking reversal of the Commissioner's decision or a remand of the case for further proceedings. For the following reasons, the motion is denied:

### Procedural History

Murphy applied for DIB on October 2, 2008, claiming that she became disabled after suffering a stroke on April 13, 2007. (Administrative Record ("A.R.") 107, 179.) The Commissioner denied Murphy's claim on November 24, 2008, (id. at

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

101), and again upon reconsideration on February 10, 2009, (id. at 102). Murphy requested a hearing before an administrative law judge ("ALJ"), (id. at 162), and on July 23, 2010, the ALJ conducted a hearing, (id. at 29-100). The ALJ subsequently concluded that Murphy is not disabled as defined by the Social Security Act and denied her application for DIB. (Id. at 24.) Murphy sought and obtained review before the Appeals Council, (id. at 11-12), which ultimately agreed with and adopted the ALJ's decision, (id. at 4-6). Murphy then initiated this civil action for judicial review, *see* 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of this court, *see* 28 U.S.C. § 636(c).

## Facts

Murphy claims that after she experienced a stroke in April 2007 she suffered from a number of lingering, limiting impairments, including numbness, dizziness, headaches, neck pain, speech difficulties, and depression. According to Murphy, these impairments are so severe that she is unable to return to her past work as a secretary or to work in any other capacity. At her July 2010 hearing before the ALJ, Murphy presented both documentary and testimonial evidence in support of her claim.

## A.     Medical Evidence

On April 13, 2007, Murphy suffered a stroke. (A.R. 541-42.) She presented at the ER with slurred speech, expressive aphasia, left-sided weakness with some facial droop, and right-sided weakness with decreased sensation. (Id. at 432.) A CT scan of the brain showed multiple areas of low attenuation in the left hemispheric

area.  (Id. at 434.)    Accordingly, Dr. Keith Mulki admitted her under his care, consulted the neurology department, and ordered a full workup for Murphy. Although an echocardiogram detected no abnormalities, (id. at 497-98), a magnetic resonance angiogram ("MRA") of Murphy's neck arteries and brain revealed severe stenosis (abnormal narrowing) in the left internal carotid artery ("ICA") that could result in possible areas of occlusion and limited flow enhancement in the left middle cerebral artery ("MCA"), (id. at 434, 477-78).  In other words, a specialized scan of the arteries in the neck and brain showed significant narrowing of the blood vessels to the brain, which may have been cutting off blood flow.  (Id. at 478.)  Dr. Mulki also ordered an MRI of the major arteries of the neck, the results of which were highly suggestive of dissection in the left ICA.  (Id. at 434.)  An ultrasound of Murphy's arteries of the neck showed abnormal narrowing on the left side and possible occlusion.  (Id. at 485.)  A repeat CT scan also revealed abnormal narrowing in the left ICA, which suggested possible dissection.  (Id. at 487-88, 495-96.)

Two days after her stroke, on April 15, 2007, Dr. Arius Patolot examined Murphy and noted that she followed commands inconsistently and exhibited signs of aphasia (difficulty communicating).  (Id. at 435.)  Murphy had normal movement in her left extremities compared with 4/5 on her right side.  (Id.)  Dr. Patolot recommended that Murphy engage in physical, occupational, and speech therapies. (Id.)  The following day, Dr. Nitin Nadkarni, a neurosurgeon, ordered a CT scan of Murphy's brain.  (Id. at 474.)  The results showed that the left side of her brain had

an area of abnormal accumulation of fluid or edema, which he attributed to her stroke. (Id.)

Before leaving the hospital Murphy underwent a neurological consultation with Dr. Joseph Mayer, who noted her past history of headaches and her diminished fluency in speech. (Id. at 541-42.) For example, although she could read a simple sentence, at times she substituted unintended words or phrases. (Id. at 542.) But her muscle strength showed only mild weakness on her right side when compared to her left and her rapid alternating finger movements were fairly good bilaterally. (Id.) Her sensation was worse in her right arm as was her loss of proprioception. (Id.) Dr. Mayer recommended physical and occupational therapy, specifically for her speech impairment. (Id.)

Less than two weeks after her hospital discharge, Dr. Mayer examined Murphy again. (Id. at 346-47.) She complained that she felt light-headed, dizzy, and tired and that she experienced occasional sharp pain in her right hand and spots in her left eye. (Id. at 346.) He noted that Murphy's speech was generally fluent. (Id.) Her extremities moved well and her rapid alternating finger movements seemed almost symmetric though she still felt a significant decrease in proprioception in her right hand when compared to the left. (Id.) Murphy followed up with Dr. Mayer on May 11, 2007, reporting that she was experiencing headaches, but her dizziness and light-headedness had gone away. (Id. at 338.) Dr. Mayer described Murphy as being "considerably frustrated by her condition," and opined that her complaints seem to stem largely from that frustration. (Id.) A

month later, on June 4, 2007, Dr. Robert Oliver examined Murphy. She denied having any significant headaches but complained of insomnia, anxiety, and depression. (Id. at 340.) Accordingly, Dr. Oliver started her on the antidepressant Zoloft. (Id.)

In addition to her doctor visits, Murphy engaged in several weeks of physical therapy beginning 10 days after her stroke. At intake, the physical therapist described Murphy's goals as increasing her grip and pinch strength, and improving her coordination on fine motor tasks. (Id. at 681.) The therapist recommended additional treatment in the form of "a detailed home exercise program." (Id.) On May 14, 2007, a physical therapist noted that Murphy had attended two therapy sessions in April but did not attend or call to cancel her last two appointments. (Id. at 680.) Based on this, the therapist recommended discharging Murphy from the program. (Id.) It is unclear when Murphy returned to physical therapy, but on June 13, 2007, the same physical therapist wrote that Murphy had undergone seven weeks of physical therapy focused on her right side weakness and coordination in an attempt to address her complaints of numbness and loss of proprioception in her right hand. (Id. at 678.) The therapist described Murphy as being "not very compliant in her home exercise program," noting that she had reported "only occasionally performing exercises per the right upper extremity." (Id.) The therapist noted that Murphy had not scheduled any additional appointments and recommended discharging her from the program. (Id.)

Murphy's follow-up visits with Dr. Mayer continued after the physical therapy records end. In early July 2007, two months after the stroke, Murphy complained of left-sided headaches that keep her awake at night. (Id. at 335.) Dr. Mayer noted that Murphy's speech was more fluent than it had been in May and that her proprioception in her right hand remained poor, although her right foot was "essentially normal." (Id.) About two weeks later, Dr. Mayer noted that Murphy still had occasional headaches but "they are better than they were last time" and had "clearly improved." (Id. at 299.) He noted that Murphy reported that she never took the prescription for Gabapentin, which was prescribed to treat her headaches. (Id.) Dr. Mayer also noted that by this time her speech was "quite fluent" and that she "had essentially normal rapid alternating finger movements, gait, and tandem gait." (Id.)

Murphy saw Melissa Schultz, Dr. Mayer's physician assistant, at the end of July 2007 and reported head pain on her right side. (Id. at 308.) Murphy reported to Schultz that she had just returned from a vacation and she had not noticed the symptom during her trip. (Id.) She also reported continued numbness and discomfort in her right forearm. (Id.) Upon examination, Schultz characterized the decreased sensation in Murphy's right arm and hand as "mild" and "improving." (Id. at 308-09.) She thought some of Murphy's discomfort might be stress-related and discussed with Murphy the need for her to take her Zoloft medication, which she had not yet started taking. (Id. at 309.)

Two months later, in September 2007, Dr. Mayer noted that Murphy reported that her left-sided headaches were better, but she experienced periodic numbness along the right side of her face that sometimes would develop into headache pain, lasting about three hours. (Id. at 306.) Murphy said this happened about three times per week. (Id.) Dr. Mayer also noted that Murphy was showing "significant" improvement in her speech—he described her as relatively fluent—and that she had started taking Zoloft, but chose to take only half the prescribed dose. (Id.) He described her as having normal strength in all four extremities and said that her proprioception was better in her right hand, although "still significantly impaired compared to the left." (Id.) Murphy was examined by Dr. Yogesh Tejpal in November 2007. (Id. at 317.) During that visit she denied any symptoms of weakness and said she only occasionally feels tingling in her right arm. (Id.) At another follow-up with Dr. Mayer in December 2007, he noted that she was reading, using her right hand "fairly well," and experiencing infrequent headaches. (Id. at 310.)

In April 2008, a year after her stroke, Murphy followed up with Dr. Mayer who noted that her main complaint was frequent, almost nightly headaches. (Id. at 300.) He noted that she had headaches even before her stroke and he doubted that they were stroke-related. (Id.) Dr. Mayer also described Murphy as having "recovered reasonably well" from her stroke, although she had some lingering "very mild aphasia" and "some significant loss of sensation." (Id.) Two months later Dr. Mayer noted that Murphy's headaches were "clearly improved," and that she

reported never taking one of the headache medicines he had prescribed for her. (Id. at 663.) By December 2009 Dr. Mayer described Murphy as having made "a very good recovery" from her stroke, despite her on-going frustration "with her persistent deficits." (Id. at 723.)

Two consulting physicians reviewed Murphy's medical file in connection with her disability claim. In November 2008 Dr. Francis Vincent wrote that there are not enough objective findings to support Murphy's claim that she was disabled prior to December 31, 2007, her date last insured. (Id. at 520.) In February 2009 Dr. Richard Bilinsky agreed, concluding that the "evidence remains insufficient" prior to Murphy's date last insured. (Id. at 517.)

## B.    The Hearing Testimony

At her hearing before the ALJ, Murphy testified that prior to her stroke in April 2007, she worked as a representative at trade shows between eight to ten times per year and also worked as a part-time secretary. (A.R. 38-39.) In March 2010, almost three years after her stroke, Murphy worked at Target as a part-time cashier but she quit after three weeks because her symptoms made it difficult to perform her job duties. (Id. at 66-67.) She testified that she often left work with terrible headaches and neck pain and experienced numbness in her extremities after standing for long periods of time. (Id.) She said that her symptoms caused her to take frequent breaks and in three weeks she called in sick twice because she had so much pain from her headaches and neck complications. (Id. at 66.)

Murphy testified that right after her stroke she spent a lot of time in physical therapy and exercised at home to help strengthen her foot and improve her speech. (Id. at 45-46.) Her daily activities included sweeping, dusting, making the beds, and preparing simple meals such as pouring cereal or heating items in the microwave. (Id. at 46-48.) However, Murphy maintained that she could not vacuum, do yard work, or shop by herself. (Id. at 48-49.) She had trouble concentrating, communicating with strangers, and remembering numbers and letters. (Id. at 51-52.) Murphy also had trouble making a fist with her right hand, buttoning her shirts or jackets, picking up coins, writing or typing, and distinguishing hot from cold. (Id. at 51-52, 57-60.) When asked about her symptoms in April 2008, Murphy stated that she could not remember how she felt. (Id. at 89-90.) However, she testified that she had headaches almost every day during the fall and winter of 2007, a condition she treated mostly with over-the-counter medications. (Id. at 44, 54.) Murphy testified that the headache pain was so severe she had to rest until it subsided. (Id. at 65.)

Murphy also testified that her other conditions included plantar fasciitis, a painful foot condition, but she said that those symptoms were "getting better." (Id. at 68.) She also explained that even though she felt depressed, she stopped taking Zoloft primarily because she did not want to gain weight, although she also said that she did not think the medication made a difference in her mood (after saying "it did help for awhile"). (Id. at 54-55.) Murphy could not remember having any side effects from the depression medication. (Id. at 55.)

Murphy's husband also testified. His statements about his wife's symptoms largely tracked Murphy's, although he claimed to remember what his wife's condition was like in April 2008. (Id. at 93.) According to Murphy's husband, during that time she spent 12 entire days per month in bed with the blinds closed as a result of her headache pain. (Id. at 95-96.) He further testified that in July 2010, at the time of the hearing, the headaches limited his wife to bed approximately seven days per month. (Id. at 97.)

The ALJ questioned both Murphy and her husband about a doctor's report from July 30, 2007, in which a physician's assistant noted that Murphy told her she had recently returned from a vacation during which one of her residual stroke symptoms seemed improved. (Id. at 73, 308.) Murphy and her husband said that they could not remember taking any such vacation. (Id. at 73.)

Vocational Expert ("VE") Pamela Tucker answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (Id. at 81-88.) The VE described Murphy's past work as a secretary and trade representative as semi-skilled and light. (Id. at 81.) In response to a series of hypotheticals posed by the ALJ, the VE testified that there were no sedentary jobs in the regional economy for a person who could neither work with the general public nor use her hands more than occasionally for fine manipulation with the dominant hand. (Id. at 81-82, 84, 88.) When the hypothetical changed to describe a person who had the capacity to sit for six hours and communicate as needed with coworkers, supervisors, and the general public, but who could only occasionally

perform fine hand manipulation, the VE testified that such a person would be able to work as a surveillance monitor, a telephone solicitor, or an information clerk—all jobs that exist in significant numbers in the economy. (Id. at 87-89.) Finally, in response to questions posed to her by Murphy's attorney, the VE noted that someone who misses more than one day of work per month, or is off-task due to pain more than 8-10% of the time, is unemployable. (Id. at 91, 98.)

## C.    The ALJ's Decision

In evaluating Murphy's claim, the ALJ applied the standard five-step sequential inquiry for determining disability, which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [she] can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

See Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012); 20 C.F.R. § 404.1520(a)(4). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet one of the impairments listed in Appendix 1, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). A claimant's residual functional capacity ("RFC") describes the most she can still do despite her limitations. Id. § 404.1545(a)(1). The ALJ uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work. Id. § 404.1520(f), (g).

Here, at step one of the analysis, the ALJ determined that Murphy had not engaged in substantial gainful activity during the period of her alleged onset date of April 13, 2007, through her date last insured of December 31, 2007. (A.R. 17.) At step two, the ALJ determined that Murphy suffered from a severe impairment in the form of "residual effects of a cerebrovascular accident, including cognitive and communication difficulties." (Id.) The ALJ noted that Murphy's headaches and depression either did not have more than a minimal effect on Murphy's ability to perform work activities or did not meet the 12-month duration requirement for severe impairments. (Id.) She found that Murphy's depression stabilizes when treated with medication and noted that Murphy reduced her Zoloft dosage by one-half on her own initiative. (Id.) The ALJ also noted that the evidence supports a near complete resolution of the headaches less than 12 months after their onset. (Id.)

At step three, the ALJ concluded that Murphy's impairment or combination of impairments does not meet or equal Listing 11.00, which addresses neurological impairments, or Listing 11.04, which addresses central nervous system vascular accidents. (Id. at 18.) Likewise, the ALJ concluded that Murphy's mental impairments did not meet or equal the criteria for organic mental disorders as set forth in Listing 12.02. (Id.) In evaluating her condition under the Listing 12.02 criteria, the ALJ applied the paragraph B criteria and found that although Murphy had significant limitations in her daily activities immediately following her stroke, within 12 months she was able to perform light housework and prepare meals. (Id.)

Accordingly, the ALJ found that she had only a mild limitation in activities of daily living. (Id.) The ALJ found no evidence of social dysfunction and so concluded she is only mildly limited with respect to social functioning. (Id.) She found a mild to moderate limitation in Murphy's concentration, persistence, or pace, based on what the ALJ perceived to be her gradual but persistent improvement in this area following the stroke. (Id.) After noting that Murphy had not experienced any periods of decompensation, the ALJ concluded that neither the paragraph B nor the paragraph C criteria were satisfied. (Id. at 19.)

Moving on to the RFC analysis, the ALJ determined that Murphy could perform the full range of light work, with a limitation to unskilled work to account for the residual effects of Murphy's stroke. (Id.) In reaching this conclusion, the ALJ found that while Murphy suffered significant functional limitations right after her stroke, she improved enough within 12 months to be able to perform basic work activities within the parameters of her RFC. (Id. at 20.) The ALJ wrote that she found Murphy's testimony regarding the persistence and limiting effects of her symptoms only partially credible. (A.R. 20-22.)

Relying on the VE's testimony, the ALJ determined at step four that Murphy is unable to perform any of her past relevant work through her date last insured, but at step five the ALJ concluded that she could perform several jobs existing in significant numbers. (Id. at 23.) Accordingly, the ALJ concluded that Murphy was not disabled from her alleged disability onset date through her date last insured

and denied her application for DIB.  (Id. at 23-24.)  The Appeals Council adopted the ALJ's findings.  (Id. at 4-6.)

## Analysis

In her motion for summary judgment, Murphy challenges the ALJ's decision in three respects.  First, Murphy argues that the ALJ improperly discredited her testimony as well as her husband's statements.  Second, Murphy contends that the ALJ erred when determining her RFC because the ALJ disregarded evidence favorable to her claim.  Finally, Murphy argues that the ALJ erred by "mechanically" applying the vocational guidelines at step five rather than incorporating the VE's testimony with respect to what Murphy describes as her "actual limitations."  (R. 11, Pl.'s Br. at 13.)  The Commissioner defends the ALJ's decision by arguing that the ALJ adequately explained her credibility analysis and her conclusion that Murphy's residual symptoms had improved sufficiently within 12 months to permit her to perform light, unskilled work.  The Commissioner argues that the ALJ properly applied the vocational guidelines to conclude that Murphy is not disabled because her RFC analysis is fully supported.

This court confines its review to the reasons offered by the ALJ, *see Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), examining whether the ALJ supported her decision by substantial evidence, *see O-Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales,* 402 U.S.

389, 401 (1971)).  This court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000).  That means this court must affirm the ALJ's decision if reasonable minds could differ over whether the claimant is disabled.  *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele,* 290 F.3d at 940, or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008) (internal quotations omitted).

A.      **The ALJ's Credibility Analysis**

In attacking the ALJ's credibility analysis, Murphy argues that the ALJ impermissibly relied on oft-criticized boilerplate language, "played doctor," and overemphasized Murphy's daily activities.  In response, the Commissioner argues that the ALJ's credibility analysis is not patently wrong or incomplete because the ALJ thoroughly explained how Murphy's complaints about her symptoms contradicted both her testimony during the hearing and the objective medical evidence.  (R. 18, Govt.'s Resp. at 3-4.)  As the Commissioner points out, Murphy has a high hurdle to overcome in challenging the ALJ's credibility assessment, which this court will overturn only if it is "patently wrong."  *See Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).  This court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Murphy "must do more than

point to a different conclusion that the ALJ could have reached." *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Put simply, this court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The focus of Murphy's argument that the ALJ erred in assessing her credibility centers on her objection to the ALJ's use of the following standard, but oft-criticized, boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 20). The Seventh Circuit has criticized similar language as being "meaningless." *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). That is because such boilerplate "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (citation and quotations omitted). Additionally, the particular language the ALJ used here comes under fire for referring to the "above residual functional capacity assessment" when in fact the RFC assessment comes later in the opinion. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). The determination of whether a claimant is able to work is often dependent on her credibility, and the ALJ flip-flops the analysis by determining the ability to work before analyzing the claimant's credibility. *See*

*Bjornson*, 671 F.3d at 645.  However, the Seventh Circuit also has made it clear that an ALJ's use of this objectionable language does not amount to reversible error if the ALJ "points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013).  In other words, whether an ALJ's use of this boilerplate language amounts to reversible error turns on whether the ALJ gives sufficient reasons, grounded in evidence, to support her ultimate determination.  *See Filus*, 694 F.3d at 868.

This court agrees with the Commissioner that in this case the ALJ sufficiently articulated the reasons underlying her credibility assessment, and so her use of the problematic boilerplate language does not amount to reversible error. *See Pepper*, 712 F.3d at 367-68.  The ALJ pointed to both medical and non-medical findings in the record to support her credibility assessment, including Murphy's ability to perform certain daily activities, her noncompliance with prescribed treatment, and the fact that she went on vacation less than three months after her stroke.  It must be noted that "not all of the ALJ's reasons for discrediting a claimant must be valid as long as *enough* of them are," *see Halsell v. Astrue*, 357 Fed. App'x 717, 722 (7th Cir. 2009) (emphasis in original), and here, all of them are. For example, with respect to the ALJ's reliance on Murphy's ability to perform housework and prepare meals, the Commissioner specifically directs the ALJ to consider an individual's daily activities when determining the claimant's credibility. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Thus the ALJ was permitted to weigh Murphy's ability to perform these tasks around the house against her

description of her symptoms and conclude that a discrepancy between the two, especially in the 12 months immediately following her stroke, diminishes Murphy's credibility. Similarly, the ALJ was entitled to view the evidence that Murphy had traveled for vacation less than three months after her stroke and her admission that she did so again in July 2008 as evidence that she was exaggerating the stroke's immediate and ongoing impact. *See, e.g., Schmidt*, 496 F.3d at 844 (including vacationing in a list of "significant" daily activities); *see also Noble v. Colvin*, __ F.Supp.2d __, 2013 WL 1809901, at *13 (N.D. Ill. Apr. 29, 2013) (noting that although "a claimant's vacation does not necessarily rule out a finding of disability," an ALJ can consider vacations in determining the credibility of a claimant's described symptoms); *Reider v. Astrue*, No. 07 CV 7271, 2008 WL 2745958, at *11 (N.D. Ill. July 11, 2008) (affirming the ALJ's credibility finding where the claimant had taken two vacations since the disability onset date). The ALJ made clear that Murphy's vacation—like her household work—was only one piece of the credibility puzzle, but that it contributed to her doubt surrounding Murphy's description of her limitations. This court cannot say that this finding is "patently wrong." *See Noble*, 2013 WL 1809901, at *13.

Murphy also contends that the ALJ impermissibly "played doctor" by discrediting Murphy in part for failing to comply with prescribed treatment, specifically physical therapy. Accordingly to Murphy, by citing her limited physical therapy attendance the ALJ "implicitly [found] that such treatment would have cured Plaintiff when there was no evidence of that." (R. 11, Pl.'s Br. at 9.) On the

contrary, the ALJ did not say or even imply that Murphy would have been cured by attending ongoing physical therapy and complying with her home exercise regimen. (A.R. 22.) Instead, she said that Murphy's failure to attend scheduled physical therapy sessions and the evidence that she did not comply with her home exercise program in the spring of 2007 suggest that her symptoms were not as limiting as she testified, even right after her stroke. (Id.) *See* SSR 96–7p, 1996 WL 374186, at *7 (noting that a claimant's failure to comply with a treatment plan can support an adverse credibility finding); *see also Schmidt*, 496 F.3d at 844 (noting that a claimant's voluntary decision to discontinue physical therapy cast doubt on the severity of the symptoms physical therapy was prescribed to relieve). Because this and the other reasons the ALJ supplied to explain her decision that Murphy is not fully credible are supported by the record, this court finds no reversible error in the ALJ's credibility finding. [2]

## B.      The ALJ's RFC Determination

Murphy also argues that the ALJ committed reversible error in crafting the RFC because, according to Murphy, the ALJ cherry-picked the evidence that supported her decision while overlooking key evidence in her favor. Murphy argues that the purportedly overlooked evidence supports a finding that she has limitations that the ALJ failed to account for in evaluating her RFC. Murphy is correct that in

---

[2] Murphy also summarily asserts that the ALJ improperly evaluated the credibility of the testimony provided by her husband. (R. 11, Pl.'s Br. at 9.) Because she has not developed any argument as to why this aspect of the ALJ's credibility assessment is erroneous, the court considers the issue waived. *See Sanchez v. City of Chicago*, 700 F.3d 919, 934 n.4 (7th Cir. 2012).

evaluating a claimant's RFC an ALJ must consider all relevant medical and non-medical evidence and provide a narrative discussion explaining how that evidence supports her conclusion. *See* 20 C.F.R. § 404.1545(a)(3). The RFC evaluation must account for "all limitations that arise from medically determinable impairments" and the ALJ "may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). On the other hand, the substantial evidence standard does not require the ALJ to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In other words, this court will uphold the Commissioner's decision if the ALJ's RFC findings are supported by substantial evidence and are explained to an extent that allows for meaningful review. *Jones*, 623 F.3d at 1160.

The court's task here is made difficult by the sparseness of Murphy's RFC argument, which consists of a long recitation of facts, punctuated by one paragraph of argument. The argument paragraph consists of a series of assertions that the ALJ overlooked evidence, supported by string cites to multiple record pages. Murphy's RFC argument appears to be premised mostly on her accusation that the ALJ impermissibly ignored several laboratory tests and one medical report from her treating physician that she says support her disability claim. A close reading of the record—which is replete with duplications of medical reports, laboratory test results, and other documents—shows that the ALJ actually did discuss many, if not most, of the cited records, but perhaps not the copy at the page number Murphy cites. For example, Murphy asserts that the ALJ ignored test reports from May

2007, December 2007, and April 2008—but that claim is erroneous. The ALJ refers to those reports several times in the RFC assessment. She considered the May 2007 MRA results in discussing the immediate impact of her stroke, but noted that her symptoms improved consistently during the follow-up visits over the next several months. (A.R. 20-21.) She pointed out that MRAs taken in March 2008 and December 2008 showed improvement in her carotid vessels and an improved degree of stenosis. (Id. at 21.) She specifically discussed the December 2007 examination results which showed improvement in Murphy's right-hand proprioception. (Id.) The ALJ noted that during that December 2007 visit Dr. Mayer observed that she was functioning "fairly well." (Id.) She further noted that in April 2008 Dr. Mayer opined that Murphy was stable and had "recovered reasonably well." (Id.) The ALJ rationally relied on those findings to conclude that within one year of her stroke Murphy was capable of performing work activities at the light exertional level.

Murphy also appears to assert that the ALJ ignored the results of a November 2008 MRI because she did not specifically discuss a particular medical report dated December 2009, more than a year after the test took place. (R. 11, Pl.'s Br. at 12.) In the December 2009 report Dr. Mayer briefly discussed the test, noting that the November 2008 MRI coupled with her most recent MRA showed that Murphy "has made a very good recovery." (Id. at 723.) Murphy's argument faulting the ALJ for excluding Dr. Mayer's December 2009 report from her RFC discussion essentially would require this court to "nit-pick" the ALJ's decision rather than give it the commonsensical reading that the substantial evidence standard of review

requires of this court. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Although an ALJ must review and consider all of the evidence, she is not required to discuss in detail and in writing every single item in the evidentiary record. *See Jones*, 623 F.3d at 1162. To discuss every piece of evidence in a 700-page record would take resources that an ALJ simply does not have. More importantly, Murphy has not explained how an explicit discussion of Dr. Mayer's report would have changed the RFC with respect to her condition prior to her date last insured.

Murphy also seems to fault the ALJ for failing to discuss a January 2010 EEG demonstrating a disturbance in brain function in the left frontal lobe, making it difficult for Dr. Mayer "to completely exclude" the possibility of an underlying seizure disorder. (R. 11, Pl.'s Br. at 12; A.R. 721.) But once again, an ALJ does not need to discuss every piece of record evidence in detail, *see McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011), especially where, as here, the ALJ's discussion is sufficient to assure that she took into account not only Dr. Mayer's findings during the year following the stroke itself but also the results of myriad different laboratory tests assessing Murphy's post-stroke condition. An ALJ need only articulate at some minimum level her analysis of the evidence to allow reviewing courts to trace the path of her reasoning. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). The EEG is the only document Murphy points to in the lengthy record to mention a possible seizure disorder. Her attorney has not developed any argument in his briefs suggesting that she has seizures or is otherwise impaired by an underlying seizure disorder. Murphy seems to claim that the EEG report supports

a finding that she is limited to a more restrictive RFC than the ALJ assigned, but she has not explained how the EEG results translate to that conclusion. Because she has not explained how the failure to discuss this report destroys the logical bridge the ALJ otherwise constructed between the evidence and her RFC conclusion, Murphy has not shown reversible error here.

Next Murphy asserts that the ALJ ignored to her detriment the examination results from her treating physician that she says suggested she had a disabling loss of sensation and proprioception in her right hand and foot lasting "much longer than a year after her stroke." (R. 11, Pl.'s Br. at 12.) Once again, Murphy's characterization of the ALJ's decision is incorrect. The ALJ did not ignore this evidence; she pointed directly to the records describing the changes in Murphy's right hand proprioception, which reflected improvement over time. (A.R. 21.) She discussed the records reflecting that Murphy's ability to walk similarly improved and that within eight months she was walking with a normal gait and without support. (Id.) The ALJ acknowledged that Murphy continued to complain about sensation loss a year after the stroke, but noted that her doctor considered her neurologically stable at that point. (Id.) That discussion is in direct contrast to Murphy's argument that the ALJ ignored the evidence regarding her reduced sensation and proprioception.

Finally, Murphy asserts—once more in an entirely summary fashion—that the ALJ failed to discuss Murphy's foot problems, which include a heel spur that Murphy asserts "would naturally tend to reduce" her RFC to sedentary work.

(R. 11, Pl.'s Resp. at 12.) She supports this one-sentence argument with a citation to three medical records. The first is a radiology report from November 2004 that simply reveals that she had a heel spur. (A.R. 591.) The second is a podiatrist report from September 2008 noting that she has a heel spur that causes her pain, especially in the morning. (Id. at 647.) The last is an October 2008 physician report noting that her plantar fasciitis was being treated with lidocaine and orthotics. (Id. at 689.) None of these reports provide any information as to what, if any, limiting impact the heel spur had or has on Murphy's ability to function. More importantly, at the hearing Murphy herself downplayed any effect from her plantar fasciitis, testifying that it was "getting better." (Id. at 68.) At no point in her testimony did she claim that her heel spur forced her to remain sedentary. Accordingly, nothing in Murphy's underdeveloped argument with respect to her heel spur undermines this court's conclusion that the RFC is supported by substantial evidence.

This court finds that the ALJ considered the relevant evidence describing Murphy's condition in the immediate aftermath of her stroke and the reports in the months that followed documenting a gradual, but steady improvement in her condition. She built the requisite logical bridge between that evidence and her conclusion that within 12 months of the alleged onset date, Murphy was able to perform light, unskilled work. *See Pepper*, 712 F.3d at 362. Accordingly, this court agrees with the government that the RFC analysis is supported by substantial evidence.

## C.     The ALJ's Application of the Vocational Grid

Murphy's final argument is that the ALJ effectively denied her a hearing on the RFC question because, she says, the ALJ mechanically and unfairly applied the vocational guidelines to find that she is not disabled.   She faults the ALJ for applying the grid because it does not account for what she describes as her non-exertional limitations, including forgetfulness, dizziness, depression, anxiety, and aphasia.   (R. 11, Pl.'s Br. at 13.)   She also argues that the VE was never given a chance to opine about the job prospects of a hypothetical person with the RFC the ALJ ultimately settled on, and that the case should be remanded for the VE to consider that RFC.

Murphy's argument would have traction only if she had convincingly shown that the ALJ erred in developing her RFC.   The argument hinges on her insistence that she has non-exertional impairments that the grid does not account for.   But as explained above, the ALJ adequately discussed why she found Murphy capable of performing the full range of unskilled light work without any additional limitations. Murphy is correct that the hypotheticals the ALJ posed to the VE were based on an RFC different than the one the ALJ ultimately settled on, but once the ALJ considered all of the record and the hearing testimony and concluded that it supports an RFC for unskilled light work, she was entitled to apply grid Rule 202.20 to find that Murphy was not disabled.   *See McKinzey*, 641 F.3d at 892 (noting that an ALJ is precluded from applying the grid "only when the non-exertional limitations substantially reduce a range of work an individual can

perform" (internal quotation omitted)).  Accordingly, Murphy has not shown that a remand is required for further testimony from the VE or for reconsideration of the ALJ's application of the grid.

## Conclusion

For the foregoing reasons, Murphy's motion for summary judgment is denied and the Commissioner's decision is affirmed.

**ENTER:**


Young B. Kim
United States Magistrate Judge